We will proceed to the second case on the calendar for the day, Smith v. Cox, and we will hear from the appellate's counsel, Mr. Glass. Good morning, Your Honor. My name is Ben Glass. I'm here on behalf of Jeremy Smith. The ERISA regulations and this Court's jurisprudence in ERISA in these long-term disability claims are supposed to ensure that an unrepresented claimant is able to navigate the process when he has been, in this case, benefits have been terminated after seven years of paying. And the regulations and the Court's jurisprudence set out guardrails. You have to tell us, you have to tell me, the claimant, why you are terminating my benefits. You have to address my favorable evidence, like address it. Tell me where I'm wrong so that I can address it in an appeal letter. You have to engage in meaningful dialogue with me. And that wasn't done in this case. And I think there's two big issues, one very specific and one larger and more general, as to why the termination decision was wrong and the District Court's affirmance of that termination decision was wrong. And the first involves this Social Security issue, which is the regs say that an insurance company, when you're denying a benefit or terminating a benefit, and you know that a claimant is on getting Social Security Disability, you have to address that. You'll recall in the first denial letter, it was Aetna who was the claims manager of this case. First denial letter, they say, hey, Mr. Smith, we're terminating your benefits after seven years. Look, we know about this reg and we know that you're on Social Security Disability, but we don't know why the Social Security Administration has been paying you for seven years. Mr. Smith goes, and I'll paraphrase, good news. As I told you, this is the summer of 2019, this termination letter is coming. He says, well, as I told you in the spring, I had an in-person examination. I was recertified last summer. And let me, as part of my appeal process, send you the recertification report, the in-person examination that Social Security doctor did, the examination that says, look, at most this fellow can sit for four hours a day. So he does that as part of his appeal. Again, he doesn't have a lawyer. He's not supposed to need a lawyer to do this. And Aetna doesn't say anything about that. They go through the process of getting their paper reviews, which we'll come back and talk about in a few minutes here. In their final denial letter, they cut and paste and repeat the same boilerplate paragraph about Social Security, saying, we know you're on Social Security. We don't know why they decided what they did. It was just cut and paste, like, huh. In the litigation in the district court, they said, oh, well, that paragraph meant we didn't know, we didn't have the original Social Security reasoning from seven years ago, something that they had never asked for before and had been paying the claim, the plan administrator had been paying the claim for these seven years. And district court said, well, that's okay. So this post hoc, like, reasoning. My argument, though, is when Aetna got his appeal, where they said, we don't know what Social Security's done, and he's sending them this five-page, very detailed report, reasonable dialogue requires someone to pick up the phone and say, hey, Mr. Smith, that thing you just sent us from last year that tells why Social Security recertified you, that's not what we're looking for. Now, that doesn't make any sense to me, right? It makes no sense. Why didn't you send the whole package? Pardon me? Why didn't you send the whole package? Why didn't you send from the 2016? Okay. It's not me. It's an unrepresented claimant. He doesn't have a lawyer at this point, number one, Judge Wynn. But number two, the most logical thing would be, hey, I was just recertified a year ago, and, Judge Wynn, remember, over and over again, Jeremy Smith had given Aetna what? Forms, releases that Aetna asked for that would have allowed Aetna to go and get the Social Security information, if that's what they really want. I don't think that's what they really wanted, Ben Glass's personal opinion here. But fundamentally, this court has said the requirement is to engage in a meaningful dialogue. If what this gentleman who works as the, he's the phone guy when your Internet goes out, where your computer doesn't work, you would give phone tech. He sends this report, which seems logical, but it's not what we, Aetna, were asking for. You just call, you engage in dialogue, and you say, not that one. We need the old one from seven years ago. So I think for that reason alone, that violation of the regulations, the decision to terminate benefits is unlawful because they're required to address the Social Security, the adverse to them Social Security opinion, and they don't do that at all. And then that problem is multiplied in the final. So now my second issue is like this decision at the end of the day is an arbitrary decision. I'll tell you why, but one of the reasons why is that neither of the two paper reviewers addressed this report either. So now Aetna has this five-page Social Security examination report. What else do they have? They have the IME that Aetna had asked for, Dr. Lee, where he's checking a box in a functional capacity form that says, look, this guy, Mr. Smith, I've examined him in person. I think he can sit somewhere between two and a half and five hours a day. You look at the cases, most of the cases that talk about what do we mean by sedentary means, at least to have the ability to sit six hours a day. Can a change of circumstance be a reason to go back to Aetna and have them reevaluate or look at this? In other words, once they make a determination, as was done here, it goes up to court. If there comes some other evidence or something that influences or shows something different, can you go back and ask them now to award you with disability benefits? Let me try to answer the question first by telling you what I'm asking you to do, the court to do. I can't go back because there's a final decision. Now we've been in litigation and now we're here in the Fourth Circuit. So I can't go back, number one. Number two, one thing that was very consistent in this was once an insurer at Aetna makes a determination, they're off the hook forever. If a person, in fact, does become shown he's disabled from it or whatever? That's right. Yes, sir. So there's nothing you can go back to show. In other words, having determined that they didn't look at this, there's no way you could have said, well, here. And then it's because procedurally you didn't do it a certain time, now you can't do it? So that's what the whole regulatory process is about. They send a denial letter that says why we terminated you and all of our reasons. So even now, though, even if we agree with you, that doesn't mean you get benefits, does it? It means it goes back for them to look at the report or we hold as a matter of law you entitled? No, let me tell you why. So now we're on the topic of remands from the Fourth Circuit. There's two kinds of remands. Remand to the district court to do something and a remand, in some cases, all the way back to the plan administrator, to have the plan administrator do it. In Gagliano, it was one of your cases, Fourth Circuit's cases. Remand went all the way back to the plan administrator because in that final denial letter, the plan administrator had raised a new issue, preexisting condition, which factually had not been developed at all. Here, and this court has said this, I went back and looked at your remand jurisprudence. When you have a record that's fully developed, so it's not that they didn't have the information because they had the information, Judge Wendt. They chose to ignore it. They chose to violate the regulations. So you don't give them, now five years after benefits have been terminated, another bite at that apple. There's a case called Gorski. The case is in our briefs. There's a disability case. There's a pension case where this court is saying, look, when the record is the record and the documents aren't going to change, but fundamentally the plan administrator violated the regulation, made an arbitrary decision, didn't consider the evidence that they had in their box, you don't send it back for another look at that. What you do is you say that termination of benefits was unlawful, so it doesn't count. He's now owed five years of back benefits. This is what the remand to the district court would be, to do the math on the back benefits, to do discretionary decision on pre-judgment interest and attorney fees, I think, for this court and the district court. And he gets reinstated to claim. Now, a year from now, if that no one's. Yes. Yes, sir. Can I ask you about that? Because I also went back and looked at our court's remand jurisprudence because I had the same question. And it looked to me like we have a good number of cases where we said there was some evidence that it appears the plan did not address, and we're going to remand it because the plan has the administrator, has the discretion. We're going to send it back to make sure they consider the full record and let them make a new decision. There are some cases where we have said we've ordered benefits to be avoided. But in those cases, it appeared that we disagreed that it was reasonable to deny benefits, right? Yes. Often those are packaged, that if evidence wasn't considered and the decision was not reasonable. But if we're only concerned about did they consider all the evidence, we usually don't do that ourselves. We usually send it back. It looks like to me we have lots of cases in Harrison and a handful of others where we said we're concerned there's a piece of evidence that was overlooked. So I understand your question, and that's why I said there's two reasons. There's the specific Social Security regulation violation, and then there's the decision writ large. And the decision writ large. I want to let you talk about the second part of your argument. On that first part, if it's just the have they considered everything, we sometimes said it would be inappropriate under the plan for us to award benefits when benefits aren't actually owed, right? So we send it back for determination of whether they're owed. If it's just the considering the evidence question. Let me answer that with respect. The better jurisprudence is when you have all of the evidence in the box and you chose to ignore something, you don't get another bite at that apple. When, as in Gagliano and some of these other cases, there's something out there that just wasn't developed. The claimant didn't develop it. Nobody thought about it. The issue was raised in the final denial letter. Then, yes, this court is often sent the case all the way back to the plan administrator for a redo. If we are going to have insurance companies play by the rules so that people like Jeremy Smith don't need to go hire people like me right from the beginning of their case, then we have to enforce it and say, no, you don't get a do-over five years down the road. So that would be, I understand what your Honor's question is. And I would suggest to the court that the better jurisprudence is no. When you have everything and you take three strikes and you miss, you are out. My question is, what is our jurisprudence? Our jurisprudence may not be the better jurisprudence in your opinion. Well, as you have indicated already, there's kind of a mixed bag. My view is when you examine the marbles in the bag, all right, that you have not remanded the case in the situation where ‑‑ Let's take it that we're going to figure that one out. I think we can figure that one out.  This is a legal thing. I appreciate it. And I think she's making a point on it. Do you have a second issue? I do, yes. The second issue is, okay, so this is a chronic pain case. The gentleman's had three surgeries, two in the spring right before he went out of work in 2012. One, I think it was two years later, back surgeries. And you have four doctors, your Honors, that examined him and said, look, at max on a great day he can sit five hours a day. This is variable. And on some days he's only going to be able to do two and a half hours a day. His treating physician thought only two hours a day. And my point here is this. That when you kind of ‑‑ A, you don't address that. Because they never really address those. They list them. They talk about them. But if you say to me, Mr. Glass, address the issue, and I just say, well, here's their arguments, that's not addressing the issue. So you never address ‑‑ you never address this adverse evidence. But when you have two fellows who are doing purely paper reviews, and you're saying, we are going to pick these two fellows' opinions about sitting capacity and sedentary work, and send those to the occupational expert who does the ‑‑ I just have a factual question. Yes, your Honor. Is one of those doctors one of the ones who called his treating physician and had a teleconference of some sort? They each called ‑‑ one called one treating physician. The other called the other. I think one got through to one of them. The other didn't get through to the other one. That's the best I can do. Who didn't get through? Well, I think Dr. Walker tried to call Dr. Hartline and didn't get through, I believe. I think that may be true. And again, this goes back to meaningful dialogue, your Honor. I mean, if this is an issue, you've got to tell Jeremy Smith, hey, we're having a hard time getting through to the doctor. This is kind of important. Can you help us? You don't just leave it to the end of the denial letter. Let me finish my thought about the paper reviewers kind of overruling. So the error is when they go to the occupational expert at Aetna and say do a transferable skills analysis, see if there's any jobs he can work at, they only send him, they only send that person the two opinions of their ‑‑ like their best opinions. They don't give that person any of this other evidence, these contrary opinions. So the basis for her opinion is flawed there. Now, look, there can be circumstances, and this court has said, and other district courts have said, there are circumstances where the paper reviewers, their opinion can be more reliable. Usually that's in some case where there's some new evidence that the treating physician didn't know about. Maybe there's surveillance. Maybe there's an activities log. None of that's true. The one thing that everybody is consistent about throughout this case is that this guy is in pain, that he is not, has not changed at all. In the seven years he's been on claim now, you know, seven plus four, 11 years, 12 years or so since the time he went out on disability. And so it was arbitrary. My argument is it was just purely arbitrary to say, well, here, let's just take these two best opinions that we have from guys who never examined him and overrule the IME doctor, independent and social security doctor. So I'll sit down now unless your court has any other questions. You'll be back. You have a few minutes in rebuttals. Thank you, Judge. We may have another bite at you before this is over. We'll hear from the counsel. Good morning, Your Honors. And may it please the court. Nicole Crowe here for the plan, Cox Enterprises plan. And I represent Aetna, which is the third party administrator for the plan. And as I was preparing for this argument, I went ahead and looked at new cases that have been decided since the court, since we were finished briefing in this court. And I came across a case that applied Booth factors in a case similar to this in terms of how we marched through the evidence. And I found a quote that I thought really should set the stage because I think this sort of was missing from my opponent's argument. And that is, this court said, like offensive linemen on a football team, standards of review lack glamor but are often decisively important. And I really like that quote in this case because in this case we have a self-funded ERISA welfare benefit plan. It's funded by contributions from Cox and Cox's employees. Cox has delegated discretionary authority to Aetna, a third party disinterested claim fiduciary, to interpret the terms of the plan and to determine whether or not individuals are entitled to benefits under the plan. So we have a pure, highly deferential abuse of discretion standard of review and no conflict of interest factor to factor in. And that is the mindset that the district court came at this case with. The district court correctly identified the standard of review and correctly applied the standard of review in looking at all the evidence that was in the administrative record. And I have a lot to unpack from what Mr. Glass had to say about a few pieces of evidence in the administrative record. But there was a lot more to it than that. And the district court correctly looked at this and said this standard of review says if it's a deliberate and principled reasoning process and it's supported by substantial evidence in the administrative record, I can't disturb that decision even if I would have come to a different result. And in this case it's clear from the district court's order that she probably would not have come to a different result because she did go through all of the evidence that Aetna looked at. But even if she would have come to a different result with the totality of the evidence that was in this administrative record, substantial evidence means more than a scintilla and less than a preponderance. And I would submit that there's way more than a scintilla of evidence in this record that supported Aetna's determination. And the district court looked at that. And if you go back, I'd like to go back to Judge Wynn's question about change of circumstances. Well, I kind of got that argument. I was only going to is there something he could do now. Really, I think the question I would ask you on this is the Helton case sets out very clearly that when an administrator has the authority to weigh, they do have conflicting evidence, it abuses discretion when it fails to address a conflicting piece of evidence. And here you have, I think the allegation relates to Dr. Harris or the social security disability. And the question is, is that a failure to address some key conflicting evidence? Even though, as you say, we look at the total evidence and the whole bit, but we do have that prohibition there. You cannot not address something that might be favoring the other side. And call it sufficient. I agree that that's the proposition that Helton stands for, that you can't ignore evidence. And in Helton, that administrator in the Helton case actually withheld relevant pieces of evidence from the record and ignored the evidence. I would submit that this is not a situation where any pieces of evidence were overlooked. You have these terms of this plan say if this individual can do any reasonable occupation, and that means any gainful activity that he is or could be come qualified for. I'm talking specifically social security disability report. Correct. And as I understand, the claimant was pro se at the time and gave you, I guess, the 2018 report. Is that right? He did. He submitted. The 2016 report. So there was no report when he was first, in 2015, first granted an award of social security disability benefits. But Edna had him sign a release. Is that correct? So that you could actually get those reports. Typically when you sign a release saying you can go and get my medical records, you kind of expect you're going to go and get them. You could go get the, or well, you could try to get from the social security administration within the guidelines, timelines allowed for an ERISA determination, which is very difficult to do practically speaking. You can request it, but the social security administration moves very slowly. And these regulations that my colleague is referring to require a decision to be made within 45 days. You can ask one time for 45 more days if you have a good reason. And that is actually what Edna did in this case when he, on appeal, submitted. You asked the social security for those records. No, because there would be no reason for them to request the social security file in 2015 because Edna had also made the same determination. And so it wasn't until late 2018 when all of the treating physicians medical records didn't support restrictions and limitations anymore that would preclude him from doing that definition that I was saying of any gainful activity that he could make 60% of his predisability earnings from. At that point, Edna did what the plan said, which is we have to get continuing proof. So they reached out to him and said we need this continuing proof from you. And at that point, he had just started seeing Dr. Hartline. He had seen Dr. Hartline on January 24th of 2019. He got an intending physician statement January 31st, a week after Dr. Hartline started treating him, and sent it in as his additional evidence. And it said he can work two hours a day, two days a week. And what do I base that on? Prior doctor. Edna couldn't determine who the prior doctor was based on the records they had. So Edna's nurse reached out to Dr. Hartline and said, hey, what is your, what's the basis for this? Can you clarify restrictions and limitations? He couldn't do that. So Edna went back to the plan and said, well, we've got the discretion to get an IME. And that's the independent medical exam that my colleague was talking about. They sent him to Dr. Lee. All of this occurred prior to determination of benefits. So they sent him to Dr. Lee. Dr. Lee examined him, reviewed all of his records, and found that he could sit for most of the day after 66% of the day and occasionally stand and walk. That's when Edna took that. So that was incorrect about sending paper reviews over to Coventry to get the transferable skill analysis. The restrictions and limitations that the alternative occupations were identified based on were the restrictions and limitations of Dr. Lee from that independent medical examination. Coventry then did what's called a transferable skills analysis. They looked at what the physical abilities Dr. Lee said that Mr. Smith had. They looked at Mr. Smith's work skills. They did a wage survey to make sure that there were occupations that he could earn 60% of his predisability earnings. Dr. Lee said, is he the one that said that he could sit for a maximum of five hours a day? Well, he said that he could work for eight hours a day and that he could sit frequently, which was on the form defined as 2.5 to 5 hours up to 66% of the day. So where did Dr. Walker get the six hours a day from? Dr. Walker got that from reviewing all of the medical records and making his own independent. Tell me which medical record says that supports that he could sit for six hours a day that he reviewed. He reviewed a lot. I wouldn't be able to. I don't mean to be coy about this, but I don't see it. I don't see any support for where he got that six from. He didn't get it from Dr. Lee. And Dr. Lee is one I guess he was reliant upon talking to, but I don't know where he got it from. Well, if you read Dr. Lee's entire report, he doesn't ever say that he can't sit six hours a day. What he's given options to check on a physical capacity form. And it says either occasionally one to 33% of the day or frequently or constantly. And he checked frequently, which is up to 66% of the day. But there was an entire. Oh, yes, ma'am. I'm sorry to interrupt you. I had a question about the relationship between the physical evaluations and the medical records and his opinions about how long he can sit and what he can do. This question seems to imply the reviewing doctor couldn't have an opinion that this gentleman can sit for six hours if the previous doctor had that opinion. But I thought the doctors, if you're doing a paper review, you look at the evaluations and the medical facts about the person, but then the conclusions that are drawn from those facts might be different by each doctor who reviews it. Is that fact, opinion, distinction, is that actual? Is that my understanding correctly or is that different? You're absolutely correct. And in fact, Dr. Walker was a physiatrist who's board certified in physical medicine and rehabilitation. So he's uniquely situated to determine functional capacity based on medical records. And so they go through and review the medical records. What is documented in where these treating physicians have seen this individual? And then from that, draw an opinion on their own specialty, their own experience and training. And in this case, he was in physical medicine and rehabilitation. He was a physiatrist. That's what they do is help people get back to work. And so they look through all of the records and form their own opinion based on this medical information. What would I think this individual could do? And then the second reviewer, he was sort of the most optimistic, if you will, Dr. Gupta, and he was board certified in internal medicine. But I really think Dr. Walker's, because of his specialty, was important. Dr. Lee also, the independent medical examination doctor, he was board certified in occupational medicine. So these are people who are trained to determine whether or not somebody has the functional capacity to go back to work. Well, I guess the only question is how do you come up with six? I understand he's an expert on all this. He can look at records. But what if he had said 10, 15? I mean, he could say that. I mean, I understand he's an expert. But that number ought to be explained from somewhere. And no other doctor said that. He's the one. And he's doing it on the records. So when you're doing it on the records, I mean, I understand he can give an opinion. I'm looking at his records, and that tend to look that way. But he hasn't even examined the guy. He doesn't know the whole bit. So it seems like he'd pull it from somewhere when you go with a specific number like that. Because that number is significant when you start saying that. Because that tells that he can do certain other kind of jobs and stuff with that number. That's my question. I got that he's an expert. He's all, you know, he can look at records and get stuff. But at some point in time, you've got to ask, well, where did you get it from? Because you're only relying your best information, even as an expert, is what you are looking at. And if what you're looking at doesn't say anything what you just said, and I realize maybe you can then give an opinion based on what you're looking at, but it seems far removed because the real subject is the person. You haven't looked at the person. These are people who evaluate. It's like almost like double hearsay, isn't it? But that's what my concern is. That's what I was asking.  And I can't speak for Dr. Walker, and neither can Aetna. The people who make these benefit determinations, they're not medical professionals, and that's why they turn to medical resources in order to get information. And I would agree that if it was so far out there, 10 or 15 hours, or so far removed from all of the other evidence, then they should probably go back and question this individual or get a different doctor to review it. But you're looking at a situation where we have no evidence of restrictions and limitations to sedentary work in the medical records provided by his own doctors, and then when you go try to get more information, you do not get information that supports that. You get an IME. The IME says he can work full-time sedentary work sitting frequently. And my opponent is focused on this form and the 2.5 to 5 hours, but one of the things that the district court really got right here that's important is when he's talking about the six hours and he's talking about sedentary work requiring that, that's a Social Security rule, and Social Security rules don't apply in ERISA plans. Those cases are Social Security cases, and just like there's no treating physician rule in ERISA cases that require deference to the treating physician's opinion, there's no rule that it has to be six hours a day. What Aetna did was look to a common vocational source, or actually Aetna hired Coventry to do a transferable skills analysis, and they looked at the Dictionary of Occupational Titles. The DOT is a common vocational assessment source, DOT and EDOT. They also looked at various other sources, occupational outlook, guidebooks, Federal Bureau of Statistics, all sorts of information and extrapolated out that he could do sedentary work under the DOT's definition, and all that definition is is that you can sit for most of the day and stand occasionally and walk occasionally. Well, even Dr. Harris's exam, that 2018 consultative exam that predated Dr. Lee's, even when she did her exam, when you read it, she doesn't say he can't work an eight-hour day. She says in an eight-hour day, he can sit 30 minutes per hour, stand 15 minutes per hour, and walk 15 minutes per hour. Well, that's 30, 45, 60 minutes per hour that he can do things, but if you're taking it and extrapolating out, well, she only says he can sit four hours, and these people only say he can sit five hours, and they say six hours, that's not when you look at the job descriptions that the Dictionary of Occupational Titles says what a job has to do, and if you, everyone agreed that he has pain and he needs to shift positions because of pain. Everyone agreed that he could sit a certain amount of time, and then he would need to stand up or walk around a little bit. They all agreed that. That there were various numbers put on it doesn't stop it from being he could sit most of the time, stand occasionally, walk occasionally, and that was a reasonable decision for Aetna to make. It was reasonable for the district court to look to it as objective evidence, and this court has held in multiple cases that it's objective evidence. So I think going back to what Dr. Walker said, where he came up with exactly six hours, it would be based on the whole list that was long of everything that he looked at, and then picking what he thinks this is the most reasonable amount of time. Either way, he only said he could do it for 45 minutes at a time. He didn't say he can sit for six straight hours. Nobody ever said that. People said that he could sit 30 minutes or 45 minutes. He would need to shift positions, and all of those decisions accounted for that, including Dr. Harris's, that he would need to change positions and only sit for 30 minutes per hour. So... Before your time, I wanted to ask about Dr. Harris's opinion. I know it's listed among the records that were given to the reviewers so that we see that Aetna had this and gave it to the reviewers to look at. But we talked with your colleague a little bit about that sentence in the denial that reappeared in the appeal denial, saying we don't have the basis for Social Security's determination. And that gives me a little bit of pause. It seems like they did have the basis because they had Dr. Harris's opinion. What effect should that have on our decision? Well, Social Security decisions are distinguishable on multiple bases and not just positive. And the letter says that, right? So you can grant Social Security disability. Those are different standards, different rules. It doesn't matter here. So that goes on in that sentence saying, and we don't even have the basis for why they made that decision. And they say that again in the appeal, which makes it sound like maybe they're forgetting about Dr. Harris. Well, Dr. Harris may very well have been one component of why the Social Security Administration decided to recertify. But as far as, there's a whole list, and I'll be out of time before I can say all the components. No, you won't. You can answer Judge Russell. The Social Security Administration has a whole different process that they go through. They look, have you done any gainful activity? Can you still do your prior gainful activity? Can you do this? Can you do that? They look at age. They look at a different vocational analysis than the vocational analysis that's done under this ERISA plan that was done here. And so not knowing the basis for, because he didn't go to an ALJ. So you're saying the basis for Social Security's decision is more than just diagnosis?  It takes into account all of the regs that govern Social Security. They have guidelines. They have to look at, there are certain diagnoses that just meet a listing. And if you just have this diagnosis, boom, you get Social Security. If it doesn't meet it, they have to look at all these other factors. And so I think what Aetna's trying to say is these are different standards, and we don't know the basis for why they made the determination they made. They didn't say we're not going to give it any weight at all. They just said we can't give it significant weight because we don't know. And generally speaking, you won't know unless they get denied, denied, and then sent to an ALJ, and the ALJ writes out his or her whole opinion, how they laid out those factors. You just don't get that. You just get a notice of award or a notice of recertification. So you're not really sure what they based it on. But what we were absolutely sure they didn't base it on was all of this new evidence that was in front of Aetna. Thank you. Thank you for your argument. We'll hear a bit of rebuttal from the appellate's counsel. Thank you. So absolutely, it's an abuse of discretion standard, but they're supposed to act like fiduciaries. Lawyers, we often talk about unbiased fiduciaries, which is redundant. I often talk about curious fiduciaries. And a fiduciary is supposed to be figuring out, how do I get to the right decision? And this is why we have the rules. This is why we have the regulations and the jurisprudence, which sets up these guardrails so that this power that we have given these plan administrators to have discretion to determine benefits and to make judicial review of their decision challenging, is they have to play by the rules. And I've outlined all the reasons, I think, why they didn't do that. All of this interesting, Ms. Crow, explanation of the Social Security differences, that's why in the letter, that's why we have the regulation that says, if you disagree with the Social Security Administration, tell us why, so that Jeremy Smith can address, she may be right, she may be wrong, I'm not a Social Security lawyer, I'm not a Social Security expert, but this is what gives, this is meaningful dialogue, and so the regs require, in my view, so that a claimant like Jeremy Smith can decide, oh, this is way over my head, let me go to a lawyer, or no, let me just send them the report, because we do know, Ms. Crow says, the Social Security doctor didn't say it couldn't work. Well, we know that right after that examination and report, Social Security recertified it, that he told Edna that. So again, a curious fiduciary would be going, hmm, gee, let's think about that, and the regs say, let's address that. We know that the two paper reviewer doctors, you would think at the very least, at the very least, their reports would have looked at the most recent, unbiased, not connected to the claimant report out there, Dr. Harris' Social Security report, and say, this is why we think she is wrong, when she says four hours, and why I say six hours, or even more than six hours. So, I mean, there's a way, again, for a paper reviewer to get there, but I think they have to point to underlying evidence. Something has changed, and the one thing that's very clear, and I said this before when I was up here, is that nobody is saying he's better. We just have different opinions. No one is saying, look, we did a squat test, and we measured your dexterity, and all this stuff, and look, you're getting better. You're not using as much narcotic medication. You're getting better. We have you on surveillance. You're getting better. There's none of that in this case. Dr. Walker, the paper reviewer, in his report, he says, look, after the type of surgeries that Jeremy Smith had, most people are going to reach maximum medical improvement in one year, and then they're not going to change. And that's exactly what has gone on throughout this case. Aetna found that that evidence was good enough for seven years. They went out and found a couple of paper reviewers who got opinions that they liked a lot better, showed them to the TSA person to get their other jobs to get to their decision. That's not what a curious, unbiased fiduciary does. I'll ask my colleagues, do you have any further questions? I do not. Thank you. Thank you. All right. Thank you, Mr. Glass. Thank you, Ms. Crow. As I said before, we're going to come down and greet both of you. By the way, you ably addressed the issues for your clients today before this court, and we appreciate that. Thank you. So the panel is standing up here. We'll come down and greet you, and you will be greeted virtually by Judge Rusher. She waves.
judges: James Andrew Wynn, Allison J. Rushing, Mary G. Lewis